RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MICHAEL ANDREW KITCHEN,

> *Plaintiff-Appellee*,

*v.*

GRETCHEN WHITMER, Governor; HEIDI E. WASHINGTON; BRIAN SHIPMAN,

> *Defendants-Appellants*,

MICHAEL C. EAGEN,

> *Defendant*.

No. 22-2160

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cv-11430—Laurie J. Michelson, District Judge.

Argued: October 25, 2023

Decided and Filed: June 28, 2024

Before: WHITE, NALBANDIAN, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Joshua L. Zeman, TROUTMAN PEPPER HAMILTON SANDERS, LLP, Southfield, Michigan, for Appellee. **ON BRIEF:** Zachary A. Zurek, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Joshua L. Zeman, Matthew J. Lund, TROUTMAN PEPPER HAMILTON SANDERS, LLP, Southfield, Michigan, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which MURPHY, J., joined. WHITE, J. (pp. 22–33), delivered a separate dissenting opinion.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  In 1987, a Michigan state court sentenced seventeen-year-old Michael Kitchen to forty-two to sixty years in prison.  Under Michigan law, Kitchen is not eligible for parole until he completes his minimum sentence.  Mich. Comp. Laws § 791.234(1).  This means he will not be considered for parole until he is nearly sixty.  Kitchen brought a pro se § 1983 suit challenging the statute against Michigan's governor, the Department of Corrections Director, and the chair of the Parole Board.  He alleges that Michigan's parole statute violates his Eighth Amendment rights because it effectively keeps him in prison for life without parole.  Defendants' chief response is that Kitchen's case must be brought through habeas corpus, not § 1983.  Or they argue that Kitchen's sentence satisfies the Constitution because he is not serving a life sentence.  The district court sided with Kitchen.  But for the reasons laid out below, we disagree with the district court and REVERSE and REMAND.

**I.**

**A.**

Following his participation in a home invasion, Plaintiff-Appellee Michael Kitchen was convicted in 1987 of armed robbery, possession of a firearm during a felony, first-degree criminal sexual conduct, and other offenses.  *Kitchen v. Whitmer*, 616 F. Supp. 3d 683, 686 (E.D. Mich. 2022).  At sentencing, the Michigan state court imposed an upward variance because this was "one of the most heinous crimes that it ha[d] presided over."  *Id.*; R.95-2, p.8, PageID 1027. The court sentenced seventeen-year-old Kitchen to an indeterminate sentence with a minimum of forty-two years and a maximum of sixty years in prison, minus good behavior credits.  *Kitchen*, 616 F. Supp. 3d at 686.[1]

---

[1]"Under Michigan's [sentencing] scheme, the judge sets the minimum term that the offender will spend in prison (here, forty-two years), the legislature, through its statutes, sets the maximum prison term (here, 60 years), and the precise amount of time that an offender will spend in prison is left to the executive branch, and more specifically, the parole board." *Kitchen*, 616 F. Supp. 3d at 692.

Kitchen has spent his adult life in the custody of the Michigan Department of Corrections (MDOC). Under Michigan law, a prisoner with an indeterminate sentence is "subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court for the crime of which he or she was convicted, less good time and disciplinary credits, if applicable." Mich. Comp. Laws § 791.234(1). Put simply, the Parole Board cannot consider Kitchen for parole until he serves his forty-two-year minimum sentence, minus any good behavior credits. So Kitchen is not eligible for parole until 2027 when he will be nearly fifty-eight-years old. *Kitchen*, 616 F. Supp. 3d at 698.

**B.**

Kitchen filed a pro se challenge under 42 U.S.C. § 1983 in the Eastern District of Michigan in 2018. He sought a declaratory judgment holding that the Michigan parole-eligibility statute, Mich. Comp. Laws § 791.234(1), was unconstitutional as applied to him because it violated his equal-protection and substantive-due-process rights under the Fourteenth Amendment and constituted cruel and unusual punishment under the Eighth Amendment. Kitchen named Michigan's governor, the director of MDOC, and the chair of the Michigan Parole Board as defendants. He later amended his complaint to substitute Governor Whitmer as a defendant, but his substantive claims remained unchanged.

Two Defendants—the director of MDOC and the chair of the Parole Board—filed a pre-answer motion to dismiss for lack of subject-matter jurisdiction and for summary judgment. They argued that Kitchen's § 1983 claim was barred by *Heck v. Humphrey*, which stated that § 1983 claims are not "*cognizable*" if they challenge the "fact or duration" of confinement or seek "immediate or speedier release." 512 U.S. 477, 481 (1994). So if an inmate challenges his confinement or seeks an early release, "habeas corpus is the exclusive remedy." *Id.* And an attempt to bring the challenge as a § 1983 claim is *Heck* barred[2] and must be dismissed. *Id.* at

---

[2]"Although often referred to as the '*Heck* bar,' this doctrine harks back to *Preiser* [*v. Rodriguez*, 411 U.S. 475 (1973),] and was clarified in a number of other cases before the Supreme Court decided *Heck*," but for "ease of reference," we refer to it as "the *Heck* bar or the *Heck* doctrine." *Hill v. Snyder*, 878 F.3d 193, 207 n.4 (6th Cir. 2017).

487.  Defendants argued that the claim is improper because Kitchen "is challenging the legality of his confinement," so the court must dismiss his case.  R.15, p.8, PageID 78.

Kitchen responded that he does not seek a shorter sentence but "an examination of the Defendants' policies and procedures governing parole eligibility."  R.16, p.3, PageID 91.  And a "favorable judgment to Kitchen would not necessarily affect the duration of his criminal sentence because prison officials would continue to retain the discretion to grant him parole," so his claim was cognizable under § 1983.  *Id.* at pp.5–6, PageID 93–94.

The district court agreed with Kitchen and ruled against Defendants in an opinion and order on August 16, 2019.  The court concluded that, despite the "legal and factual support" for Defendants' position, "Kitchen is not required to bring his federal constitutional claims via a petition for a writ of habeas corpus," and he could pursue them under § 1983.  *Kitchen v. Snyder*, No. 18-11430, 2019 WL 3859887, at *2 (E.D. Mich. Aug. 16, 2019).  Even "if Kitchen's direct attack" on the Michigan parole statute "is an indirect attack on his 42-year minimum sentence, a successful attack" only means "that Kitchen would immediately come within the parole board's jurisdiction" and the "board could deny parole."  *Id.*  So even if success here "comes in the form of a new, shorter minimum sentence," it "would not *necessarily* speed Kitchen's release."  *Id.* The district court thus rejected Defendants' *Heck* argument.  The *Heck* issue was not litigated any further.

## C.

Kitchen filed a second amended complaint, again pro se, this time expanding on his due-process and equal-protection arguments as well as reasserting his Eighth Amendment claim. Defendants again moved to dismiss, but the district court ordered Defendants to "*only*" address Kitchen's equal-protection and substantive-due-process claims because Defendants had "already attempted to dismiss Kitchen's Eighth Amendment claim."  R.49, p.3, PageID 277.  The court then issued another opinion, dismissing the equal-protection and due-process claims and interpreting Kitchen's Eighth Amendment claim as stating causes of action under the Supreme Court's rulings in *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012).  The court also appointed counsel for Kitchen.  *Kitchen*, 616 F. Supp. 3d at 687.

Kitchen next filed a third amended complaint, updating the named Defendants-Appellants to Michigan Governor Gretchen Whitmer, MDOC Director Heidi Washington, and Michigan Parole Board Chairperson Brian Shipman.  Kitchen pressed the argument that his lack of parole eligibility violates the Eighth Amendment under *Miller* and *Graham* and violates the Michigan Constitution.  *Kitchen*, 616 F. Supp. 3d at 687–88.  Kitchen requested a declaration that Michigan Compiled Laws § 791.234(1) is unconstitutional as applied to him as well as injunctive relief "requiring the Michigan Parole Board to immediately take jurisdiction" over Kitchen and give him "a parole hearing."  R.78, p.12, PageID 697.

When Defendants again moved to dismiss, the district court rebuked them for taking another "bite at the apple," ordering that they could not file any more dispositive motions.  R.85, p.2, PageID 755.  In response, Defendants effectively withdrew their motion to dismiss so that they could file a dispositive motion at the completion of discovery.

The parties proceeded to discovery.  Kitchen retained an expert witness, Dr. Christopher Wildeman, who testified about Kitchen's life expectancy.  Wildeman estimated that Kitchen had a 20% chance of living to between age 55 and 60, a 60% chance of living to between age 60 and 65, and a 20% chance of living to between age 65 and 70.  *Kitchen*, 616 F. Supp. 3d at 698, 701–02.  Defendants did not offer their own expert witness for they believed Wildeman's "testimony so clearly benefit[ed] Defendants."  R.98, p.19 n.2, PageID 1095.  Both parties filed motions for summary judgment at the close of discovery.

The district court entered its opinion and order on July 21, 2022, partially granting summary judgment for Kitchen.  It found that Kitchen lacked standing to bring his *Miller* claim, declined to exercise supplemental jurisdiction over the Michigan Constitution claim, and ruled for Kitchen on his *Graham* claim because the "undisputed record shows that Kitchen will become eligible for parole when he most likely has only four or five years left to live."  *Kitchen*, 616 F. Supp. 3d at 689, 702–03.

Defendants filed a notice of appeal on August 17, 2022, naming the district court's August 16, 2019, opinion and order, as well as the July 21, 2022, opinion and order.  But our court sent it back for lack of appellate jurisdiction, holding that there was no final order.  *Kitchen*

*v. Whitmer*, Nos. 22-1732, 22-1773, 2022 WL 18694505, at *2 (6th Cir. Oct. 4, 2022). On remand, the parties submitted a stipulated remedial plan, which the court adopted. *See Kitchen v. Whitmer*, No. 18-11430, 2022 WL 18911614, at *1–2 (E.D. Mich. Dec. 21, 2022). Under the plan, Kitchen's new earliest release date was May 1, 2023, and the Parole Board would "conduct an in-person interview with Kitchen" to decide whether to release him on parole. *Id.* The parties agreed to stay the district court order pending appeal. *Id.* at *1.

Defendants timely appealed one week later. In their notice of appeal, they again named the district court's August 16, 2019, order and added the December 21, 2022, final judgment. So they appealed both the district court's decision on whether Kitchen could bring his claim through § 1983 and the order moving Kitchen's earliest release date to 2023.

**II.**

The district court decided this case on summary judgment, so we review de novo. *Bormuth v. County of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017) (en banc). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants advance these arguments on appeal: (1) Kitchen must bring his claim in habeas rather than § 1983; (2) Kitchen lacks standing; (3) the *Rooker-Feldman* doctrine precludes federal-court review; and (4) Kitchen's sentence does not violate the Eighth Amendment under *Graham*.

This case "lies at the intersection of the two most fertile sources of federal-court prisoner litigation—the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, and the federal habeas corpus statute, 28 U.S.C. § 2254." *Heck*, 512 U.S. at 480. Courts have long struggled to mark the appropriate boundary between these two statutes, as "it is sometimes difficult to draw the line" between them. *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 76 (2009) (Alito, J., concurring).

Before we can address this issue, however, we must ensure that it is properly before us.

**III.**

**A.**

The State argues that Kitchen has no standing to bring his case. But the State brings its standing challenge second in its brief—after it argues the *Heck* issue, implying that we ought to resolve the *Heck* issue first. So this raises an order-of-operations question. We of course must ensure that litigants have standing under Article III before assessing their claims. *Steigerwald v. Comm'r of Soc. Sec.*, 48 F.4th 632, 636 (6th Cir. 2022). And we must resolve a threshold jurisdictional issue like standing before reaching the "merits" of a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998). If *Heck* is not jurisdictional, then standing's jurisdictional inquiry must precede any discussion of *Heck* or § 1983. *Id.* at 101–02. On the other hand, if a *Heck* challenge presents a jurisdictional inquiry, then we could decide *Heck* and standing in whichever order we prefer. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023); *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).[3]

*Steel Co.* would seem to answer this question. There, the Court said that it is "firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Steel Co.*, 523 U.S. at 89. And the *Heck* question appears to ask which of two possible causes of action is "valid," rather than going to the "courts' statutory or constitutional *power* to adjudicate the case." *Id.*

But to complicate matters, the circuits are divided on whether *Heck* is jurisdictional. Though the First Circuit said a *Heck* issue implicates a court's subject-matter jurisdiction, *O'Brien v. Town of Bellingham*, 943 F.3d 514, 529 (1st Cir. 2019), the Third, Fifth, and Seventh Circuits think a successful *Heck* claim shows that the plaintiff does not have a cause of action under § 1983. *Vuyanich v. Smithton Borough*, 5 F.4th 379, 389 (3d Cir. 2021); *Crittindon v. LeBlanc*, 37 F.4th 177, 190 (5th Cir. 2022); *Polzin v. Gage*, 636 F.3d 834, 837–38 (7th Cir. 2011). And the Ninth and Eleventh Circuits are undecided but have cast doubt on the notion that

---

[3]The Supreme Court has acknowledged that there are issues that courts possess discretion to decide at the outset before assessing subject-matter jurisdiction. *See, e.g.*, *Ellis v. Dyson*, 421 U.S. 426, 433–34 (1975) (*Younger* abstention); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) (personal jurisdiction); *Sinochem*, 549 U.S. at 435–36 (*forum non conveniens*).

*Heck* is jurisdictional. *Washington v. L.A. Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1056 (9th Cir. 2016); *Teagan v. City of McDonough*, 949 F.3d 670, 678 (11th Cir. 2020). So although the majority of the circuit decisions point in one direction, they are not unanimous.

And we have recently implied that *Heck* is not jurisdictional.[4] *See Chaney-Snell v. Young*, 98 F.4th 699, 707–11 (6th Cir. 2024). In that case, we determined that we did not have pendent appellate jurisdiction over a *Heck* argument in a qualified-immunity appeal. *Id.* at 709–10. Although we didn't say that *Heck* wasn't jurisdictional, we implied as much, noting that (1) "the Court adopted the *Heck* bar to resolve a choice-of-law problem," *id.* at 708, (2) *Heck* "exists to determine whether (and when) a § 1983 plaintiff has 'a complete and present cause of action,'" *id.* at 710 (quoting *McDonough v. Smith*, 588 U.S. 109, 115 (2019)), and (3) *Heck* "creates only a precondition to a § 1983 suit (invalidation of the prior conviction)—not an absolute bar to the suit," *id.* at 711. So we analyze standing first before proceeding to the *Heck* issue.

Standing under Article III requires (1) an "injury in fact" that is (2) "fairly traceable to the challenged conduct of the defendant" and is (3) "likely to be redressed by a favorable judicial decision." *Steigerwald*, 48 F.4th at 636 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Defendants argue that Kitchen has not suffered an injury, nor can he show traceability. Kitchen contends that he is injured because he is deprived of a parole hearing, and this injury is traceable to Defendants because they enforce the law depriving Kitchen of parole consideration.

---

[4]Our court, following the Supreme Court's lead, has phrased *Heck* challenges in terms of whether a § 1983 claim is "cognizable," which likely implies that a *Heck* challenge more properly sounds in failure to state a claim as opposed to lack of subject-matter jurisdiction. *See, e.g.*, *Thomas v. Eby*, 481 F.3d 434, 438 (6th Cir. 2007) ("[S]uits challenging the fact or duration of confinement fall within the traditional scope of habeas corpus and accordingly are not cognizable under § 1983."); *English v. Ghee*, 13 F. App'x 306, 307–08 (6th Cir. 2001) ("English fails to state a claim under § 1983 as his complaint is barred by *Heck*. . . . Because a ruling on these arguments would affect the validity of his confinement, these claims are not cognizable under § 1983." (citation omitted)). This and the fact that the Supreme Court has "cautioned . . . against profligate use" of the word "jurisdictional," *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 81 (2009), should give us reason to pause before concluding that *Heck* issues necessitate jurisdictional inquiries.

We agree with Kitchen.  Kitchen suffered an injury (being kept in prison without parole) that is traceable to Defendants (who oversee enforcement of Michigan's parole statute)[5] and is redressable by a ruling ordering a parole hearing (like the one below).  Importantly, even if we view his challenge as an attack on his conviction, he still has standing: "An incarcerated convict's . . . challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction."  *Spencer v. Kemna*, 523 U.S. 1, 8 (1998); *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009) (quoting same language).  So Kitchen has shown he has standing to bring his claim.

**B.**

The State also contends that Kitchen's claim is barred by the *Rooker-Feldman* doctrine. *See generally Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).  And for the same reason that we must address standing before considering *Heck*, we must also address the *Rooker-Feldman* issue as a threshold question.  "The *Rooker-Feldman* doctrine bars lower federal courts from conducting appellate review of final state-court judgments because 28 U.S.C. § 1257 vests sole jurisdiction to review such claims in the Supreme Court."  *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012).  So if a plaintiff tries to challenge a state-court judgment in federal district court, the federal court "lack[s] subject-matter jurisdiction over such claims."  *Skinner v. Switzer*, 562 U.S. 521, 531–32 (2011).  The "courts of appeals disagree about whether a federal court may bypass *Rooker-Feldman*" to reach an easier question on the merits, *Edwards v. City of Jonesboro*, 645 F.3d 1014, 1018 (8th Cir. 2011), but the language of *Rooker-Feldman* indicates that the doctrine deals with subject-matter jurisdiction, so we address that before the *Heck* claim.

---

[5]We acknowledge that there is a potential issue here with Kitchen's standing to pursue a claim against Governor Whitmer specifically.  We have held that a governor's general take-care power is too attenuated for purposes of establishing standing.  *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031–32 (6th Cir. 2022).  And Kitchen doesn't appear to allege that the Michigan governor has any particular role in enforcing Michigan's parole regime.  But our ultimate disposition of this case does not require us to differentiate between the Defendants in this way, so we leave that question for another case.  *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

The *Rooker-Feldman* inquiry is straightforward:  We look at the "source of the injury the plaintiff alleges in the federal complaint," and if the source is anything other than "the state-court judgment itself," then *Rooker-Feldman* does not apply.  *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020); *see also id.* at 409 (Sutton, C.J., concurring) ("Absent a claim seeking review of a final state court judgment, a federal court tempted to dismiss a case under *Rooker-Feldman* should do one thing: Stop.").

Like standing, this too can be resolved quickly.  Kitchen's challenge can be construed one of two ways—either cognizable as a § 1983 suit or only permitted in habeas—and either way, *Rooker-Feldman* is no bar.  Kitchen's § 1983 complaint alleges that Michigan's parole-eligibility statute deprives him of parole.  And the Supreme Court has held that such a claim is permitted in federal court.  *Skinner*, 562 U.S. at 532–33 (holding that *Rooker-Feldman* does not stop a prisoner's § 1983 challenge to a state statute).  But even if we view Kitchen's claim as attacking his conviction or sentence, as we discuss below, then we should view such a challenge as essentially a habeas claim.  *See Hill v. McDonough*, 547 U.S. 573, 579 (2006) (quoting *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus.")).  And habeas claims fall into a well-established exception to *Rooker-Feldman*, allowing federal court review of state court judgments.  *See, e.g.*, *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 n.8 (2005).  So regardless of whether we view it as a § 1983 or a habeas claim, *Rooker-Feldman* does not keep Kitchen's case out of federal court.

**IV.**

**A.**

That brings us to the *Heck* issue.  Defendants raised *Heck* in response to Kitchen's original complaint.  *See* R.15, pp.3–9, PageID 73–79.  But the *Heck* "argument was not raised again in response to Kitchen's amended complaints."  Appellants Br. at 32 n.8; Appellee Br. at 14–16.  Does this mean Defendants forfeited the *Heck* issue?  We think not.

The Sixth Circuit has repeatedly held that "an argument not raised before the district court is waived on appeal."  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008);

*see also Morgan v. Trierweiler*, 67 F.4th 362, 367 (6th Cir. 2023); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614 (6th Cir. 2014) (collecting cases). This produces the corollary principle that when we hear an issue on appeal, "we consider 'whether the issue was properly raised before the district court.'" *Morgan*, 67 F.4th at 367 (quoting *Scottsdale*, 513 F.3d at 553).

Looking at the procedural history, we see "the issue was properly raised before the district court." *Scottsdale*, 513 F.3d at 553. Indeed, the Defendants raised and briefed it in response to the original complaint, *see* R.15, pp.3–11, PageID 73–81; R.16, pp.3–6, PageID 91–94, and it was the subject of the district court's August 16, 2019 opinion and order, *see Kitchen*, 2019 WL 3859887, at *1–2.

Once the court decided the *Heck* issue in that order, Kitchen filed two more amended complaints. After the second amended complaint, the district court ordered the Defendants to address "*only*" the "equal-protection and substantive-due-process claims" because they had "already attempted to dismiss Kitchen's Eighth Amendment claim." R.49. Then after the third amended complaint, the district court admonished Defendants for filing another dispositive motion and ordered that this would be their last. R.85, p.2, PageID 755. So they withdrew this motion to preserve the ability to move for summary judgment after discovery, which they did.

Defendants didn't present the *Heck* issue in their final motion for summary judgment, but their notices of appeal indicate that they thought the district court's August 16 order settled the issue. *See* Oral Argument at 6:04–20 (explaining why counsel believed the *Heck* issue was preserved and ready for appeal). And Defendants' belief is reasonable given that the district court restricted both the number and subject matter of later dispositive motions. Both notices of appeal identified the August 16 order as one they were appealing alongside the final orders from July and December 2022. Under these circumstances, Defendants sufficiently raised the issue below.

Deciding the *Heck* issue on appeal, moreover, does not conflict with the prudential concerns underlying our forfeiture and waiver rules. *See Scottsdale*, 513 F.3d at 552. These issue-preservation rules ease "appellate review 'by having the district court first consider the issue.'" *Id.* (quoting *Foster v. Barilow*, 6 F.3d 405, 409 (6th Cir. 1993)). The rules also ensure

"fairness to litigants by preventing surprise issues from appearing on appeal." *Id.*; *see also Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022).

Considering the *Heck* argument now does not conflict with either concern. The district court first considered the *Heck* issue and ruled on it after considering the argument's "legal and factual support." *Kitchen*, 2019 WL 3859887, at *2. And Kitchen should not be "surprise[d]" that Defendants press *Heck* on appeal. *Scottsdale*, 513 F.3d at 552. It was Defendants' first response to the original complaint, putting Kitchen on notice that they believed his claim was barred by *Heck*. *See* R.15, pp.3–11, PageID 73–81. Kitchen then responded and specifically addressed the issue. *See* R.16, p.3–6, PageID 91–94. It therefore does not prejudice Kitchen to consider the *Heck* issue now.

**B.**

With the *Heck* issue properly before us, we turn to the question it raises—must Kitchen bring his claim in habeas rather than § 1983? The Supreme Court has attempted to provide an answer in a line of cases dating back fifty years.

The Court first confronted the interplay of § 1983 and habeas in *Preiser v. Rodriguez*, 411 U.S. 475 (1973). When state prisoners used § 1983 to challenge the deprivation of their good-conduct-time credits, which would cause their immediate release if restored, the Court acknowledged the "broad language of [§] 1983" but held that inmates must bring their claims under habeas for three reasons. *Id.* at 476–77, 489. First, the language of the habeas statute is "more specific" than § 1983. *Id.* at 489. Second, after reviewing the history of the writ of habeas corpus, the Court concluded that "in each case" where a prisoner's "grievance is that he is being unlawfully subjected to physical restraint," habeas "has been accepted as the specific instrument to obtain release from such confinement." *Id.* at 486. Third, because § 1983 does not require exhaustion of state-law remedies, allowing claims to proceed under § 1983 raised "federal–state comity" concerns. *Id.* at 491. These reasons led the Court to hold that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500; *see also Wilkinson*

*v. Dotson*, 544 U.S. 74, 78–79 (2005) (summarizing that "considerations of linguistic specificity, history, and comity led" the *Preiser* Court to hold that claims covered by habeas cannot be brought under § 1983).

The Supreme Court later elaborated on this holding in *Heck*. There, a state prisoner brought a § 1983 claim seeking damages—but not release from custody—against state officials who allegedly targeted him with an "unlawful, unreasonable, and arbitrary investigation." 512 U.S. at 479 (citation omitted). In its key holding, the Court explained that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. The Supreme Court spoke clearly: If a successful claim "would necessarily imply the invalidity" of the "conviction or sentence," then "the complaint must be dismissed." *Id.* Because a successful unlawful investigation claim would "challenge[] the legality of the conviction," the claim needed to go through habeas instead of § 1983. *Id.* at 490.

That brings us to *Wilkinson*, the most recent Supreme Court case to address this issue at length. The two prisoners in *Wilkinson* requested parole, which the parole board denied. 544 U.S. at 76–77. In denying parole, however, the board applied "parole guidelines first adopted in 1998," which came after the prisoners "began to serve" their terms. *Id.* They both asked a federal district court to conclude that the use of the 1998 guidelines violated the Due Process Clause and the Ex Post Facto Clause and sought an injunction that ordered a new parole hearing under constitutionally proper procedures. *Id.* at 77.

To begin its analysis, the Supreme Court surveyed the cases discussed above and reasoned that, throughout the "legal journey from *Preiser*" onward, "the Court has focused on the need to ensure that state prisoners use only habeas corpus" when "they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Id.* at 81. A § 1983 action is thus barred "*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82. Applying that rule, the Supreme Court held that plaintiffs' claims were "cognizable under § 1983" because neither prisoner sought "an injunction ordering his immediate or speedier release," and

"a favorable judgment" would "not necessarily imply the invalidity of their convictions or sentences." *Id.* at 82 (cleaned up).

Our circuit applied this rule in two cases relevant here. In *Wershe v. Combs*, a state prisoner's "initial opportunity for parole was denied after a public hearing in 2003," and the board decided not to consider him for parole again until 2017. 763 F.3d 500, 502 (6th Cir. 2014). The prisoner alleged that he was procedurally given only cursory consideration. *Id.* at 505–06 (complaining of "perfunctory consideration," the parole board's failure to interview him, and its refusal to explain its reasoning). The prisoner brought a § 1983 suit against Michigan Parole Board members "alleging that the parole consideration process did not afford him a meaningful opportunity for release," *id.* at 502, essentially bringing a claim under *Graham*. Rather than challenge a specific statute, the prisoner challenged parole procedures and administration: The inmate "does not seek direct release from prison or a shorter sentence; he seeks a change in the procedures used to determine whether he is eligible for parole." *Wershe*, 763 F.3d at 504. Because success would "not necessarily affect the duration of his sentence because prison officials would retain discretion regarding whether to grant him parole," the *Heck* line of cases did not bar the § 1983 claim. *Id.* (quoting *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007)).

Three years later, this court addressed a similar question in *Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017). The plaintiffs in *Hill* asserted that Michigan's "policies and procedures governing access to prison programming and parole eligibility, consideration, and release deny them a meaningful opportunity for release on parole before the end of their natural lives." *Id.* at 209 (internal quotation marks omitted). The *Hill* court noted that "claims that ordinarily fall within the scope of § 1983 are unavailable to prisoners if they necessarily imply the invalidity of a conviction or sentence." *Id.* at 207 (cleaned up). And the "word 'necessarily' must not be ignored—if invalidation of a conviction or speedier release would not automatically flow from success on the § 1983 claim, then the *Heck* doctrine is inapplicable." *Id.* The court then reasoned that, because the prisoners "do not seek direct release from prison or a shorter sentence, but instead seek an examination" of the parole "policies and procedures," this "circuit has already expressly found such challenges cognizable under § 1983." *Id.* at 210.

A clear and consistent two-part rule emerges from this precedential backdrop. Prisoners can "use only habeas corpus" if "they seek to invalidate the duration of their confinement— either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson*, 544 U.S. at 81. So prisoners can "proceed under § 1983" if (1) they do not seek an "injunction ordering immediate or speedier release into the community," and (2) "a favorable judgment would not necessarily imply the invalidity of their convictions or sentences." *Skinner*, 562 U.S. at 533–34 (cleaned up). The Supreme Court most recently summarized it this way: The "simplest cases" for when a claim must be brought through habeas "arise when an inmate, alleging a flaw in his conviction or sentence, seeks immediate or speedier release from prison," but the "[s]lightly less obvious" cases occur "when the relief he seeks would 'necessarily imply the invalidity of his conviction or sentence.'" *Nance v. Ward*, 597 U.S. 159, 168 (2022) (quoting *Heck*, 512 U.S. at 481, 487). These less obvious cases nevertheless "lie within the core of habeas corpus." *Id.* at 167 (internal quotation marks omitted).

## C.

With this legal rule in mind, we turn to this case. The district court below—and now Kitchen on appeal—reason that Kitchen's requested relief would not necessarily lead to an early release from prison, so Kitchen can bring his claim under § 1983. R.31, pp.4–5, PageID 153–54; Appellee Br. at 19–20. Defendants disagree. They contend that it is "flawed" to focus on whether Kitchen will get an early release because it ignores whether success for Kitchen would necessarily imply the invalidity of his sentence. Appellants Br. at 47, 49–53. And Defendants believe there is "no way for Kitchen to challenge Michigan's parole jurisdiction statute" without "invalidating his underlying criminal sentence." *Id.* at 32.

Defendants have the better argument. We hold that Kitchen's claim must be brought through habeas for two reasons. First, the district court focused solely on whether a successful claim would spell an early release for Kitchen and overlooked whether the claim implicates the validity of his sentence. Second, once we apply the correct legal test, we see that Kitchen's claim would necessarily imply the invalidity of his sentence if successful. The relief granted by the district court and its own reasoning demonstrate this very point.

**1.**

First, the correct legal test.  As mentioned, the district court analyzed only whether Kitchen's requested relief would lead to a quicker release and ignored the question of invalidity, an essential part of the Supreme Court's test.  Indeed, our court has emphasized that a focus *only* on whether a challenge will lead to a speedier release is a "crabbed reading" of Supreme Court caselaw.  *Sampson v. Garrett,* 917 F.3d 880, 882 (6th Cir. 2019) (criticizing *Fuller v. Nelson*, 128 F. App'x 584, 586 (9th Cir. 2005), because *Fuller* reasoned that *Heck* does not apply when the requested relief would not yield immediate release).  The Supreme Court does "not consider *Heck* inapplicable *only* because the claims' success would not mean release."  *Id.* (citing *Wilkinson*, 544 U.S. at 82).  Rather, the Supreme Court has "emphasized" that "new parole procedures (or even a grant of parole for that matter) would not imply the invalidity of the prisoners' original sentences."  *Id.* (citing *Wilkinson*, 544 U.S. at 83–84).  *Sampson* thus clarifies that courts must consider *both* speedier release *and* invalidation of the sentence to remain faithful to Supreme Court guidance.

We have reiterated the importance of making sure prisoners do not use vehicles other than habeas to invalidate their sentences.  In *United States v. McCall*, we addressed whether a change in precedent qualified as an extraordinary and compelling reason that could justify a sentence reduction under a compassionate-release statute.  56 F.4th 1048, 1050 (6th Cir. 2022) (en banc), *cert. denied,* 143 S. Ct. 2506 (2023).  One reason for denying relief under the compassionate-release statute was that, if the prisoner were to prevail on his claim that his sentence had been illegal, "a court would alter the duration of his sentence because his sentence would be different today, *thereby implying the unlawfulness of his sentence as originally imposed*."  *Id.* at 1058 (emphasis added).  Such a claim must be brought through habeas because the "habeas-channeling rule"[6] expressed in *Wilkinson* instructs that "habeas serves as the avenue

---

[6]The habeas-channeling rule referred to in *McCall* is explained in *United States v. Jenkins*, 50 F.4th 1185, 1203–04 (D.C. Cir. 2022) ("[T]he habeas-channeling rule applies so long as 'success in the inmate's action would necessarily demonstrate the invalidity of confinement or its duration.'  And for [the prisoner] to prevail on his [] claim, the court would necessarily have to conclude that his sentence was unlawfully imposed." (citations omitted) (quoting *Wilkinson*, 544 U.S. at 82)).

to attack the lawfulness of confinement," including "attacks" implying the unlawfulness of custody. *Id.*[7]

So here, the district court erred by considering only whether quicker release will result if Kitchen's challenge succeeds. From *Preiser* to *Wilkinson*, the Court has emphasized "the need to ensure that state prisoners use only habeas corpus" if they try "to invalidate the duration of their confinement," either "*directly*" by requesting an early release or "*indirectly*" through a judicial holding that "necessarily implies the unlawfulness" of one's custody. *Wilkinson*, 544 U.S. at 81. Both halves of the test are independently dispositive, yet the district court treated only the first half as essential. And once we establish the proper test, the next question is whether Kitchen's claim fails it.

**2.**

The short answer is yes. Kitchen's claim, if successful, would necessarily imply the invalidity of his sentence. Here's the long answer. Kitchen's claim boils down to this: Keeping him in prison for forty-two years before he is eligible for parole violates his Eighth Amendment rights. He claims the Michigan parole statute is to blame for his unconstitutional confinement. But this argument neglects the reality that the statute does not operate alone. He is in prison for that long not just because of the statute but also because of his sentence.

When Kitchen was sentenced in 1987, Michigan's parole statute specified that prisoners would not be eligible for parole until they served their minimum sentence. *See* 1982 Mich. Pub.

---

[7]The history of the writ of habeas corpus also supports this conclusion. In *Preiser*, the Court explained that by "the end of the 16th century, there were in England several forms of habeas corpus, of which the most important and the only one with which we are here concerned was *habeas corpus ad subjiciendum*—the writ used to 'inquir(e) into illegal detention with a view to an order releasing the petitioner.'" 411 U.S. at 484 (quoting *Fay v. Noia*, 372 U.S. 391, 399 n.5 (1963)); *see also Ex parte Bollman*, 8 U.S. 75, 95 (1807). With this "common-law history of the writ" as the backdrop, it is clear "that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser*, 411 U.S. at 484. Also, in *Department of Homeland Security v. Thuraissigiam*, the Supreme Court explained that in "1768, Blackstone's Commentaries" said that "habeas was a means to 'remov[e] the injury of unjust and illegal confinement.'" 591 U.S. 103, 117 (2020) (quoting 3 William Blackstone, *Commentaries* 137)). Similarly, "Justice Story described the 'common law' writ the same way," explaining that habeas "is the appropriate remedy to ascertain . . . whether any person is rightfully in confinement or not." *Id.* (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1333, 206 (1833)). Kitchen essentially argues that keeping him in prison for forty-two years before parole violates the Constitution under *Graham*. No matter how he frames his requested relief, he is basically challenging the legality of his custody.

Acts 1356.**8**   In Michigan, therefore, a judgment imposing a minimum sentence of forty-two years could not be understood as anything but a sentence without parole for forty-two years.  So a prisoner's minimum sentence and a prisoner's parole eligibility date are inextricable. *See Robinson v. Woods*, 901 F.3d 710, 718 (6th Cir. 2018) (rejecting the argument, in a different legal context, that one can disentangle a prisoner's minimum sentence and the prisoner's parole eligibility date under Michigan law).  For example, had the judge sentenced Kitchen to a thirty-year minimum sentence, then he would be eligible for parole after thirty years even though Section 791.234(1) would remain the same.  So Kitchen being in prison without parole is not the sole product of Section 791.234(1).  It stems from his sentence.  It is impossible to challenge the statute as applied to a particular prisoner without attacking the sentence.

So when Kitchen complains of being kept in prison without parole, even if he frames it as a complaint against Section 791.234(1), he is inevitably challenging his sentence, the true source of the alleged constitutional injury.  If his challenge succeeds, his forty-two-year minimum sentence will be constitutionally invalid.  And that sentence will have to be replaced with a shorter minimum sentence that ensures his parole eligibility.  *See Kitchen*, 2022 WL 18911614, at *1 (granting relief that moves Kitchen's earliest release date from 2027 to 2023).  Kitchen thus cannot pass the Supreme Court's test.  To see why eligibility for parole and the sentence are inseparable, compare Kitchen's case to *Wershe*, *Hill*, and *Wilkinson*.

*Wershe* addressed a prisoner who was already considered for parole and sought procedural remedies.  *See Wershe*, 763 F.3d at 502, 506.  Relief ordering adequate parole consideration, therefore, did not risk invalidating his underlying sentence or conviction.  Indeed, it implied nothing about the underlying sentence as imposed—it only addressed parole procedures as administered.  *Wershe* is thus not on all fours with Kitchen's case.

---

**8**The 1982 version of Michigan Compiled Laws § 791.234(1) that was in place when Kitchen was sentenced in 1987 says: "A prisoner sentenced to an indeterminate sentence and confined in a state prison or reformatory with a minimum in terms of years *shall be subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court for the crime of which he or she was convicted*, less good time allowances, if applicable." 1982 Mich. Pub. Acts 1356 (emphasis added).  It remains substantially the same today.  *See* Mich. Comp. Laws § 791.234(1).

*Hill* teaches the same lesson.  Michigan amended its parole statutes to account for an intervening Supreme Court case.  *See Hill*, 878 F.3d at 200.  *Hill* considered several statutory provisions though none of them presented the precise question here.  *Id.* at 201–02.  The analysis in *Hill* focused on whether a successful § 1983 claim would affect sentence duration.  *See id.* at 211.  *Hill* operates at a higher level of generality than our case because there was no direct challenge to a particular statute or, for that matter, a particular sentence.**9**  The most analogous prisoners in *Hill* did "not seek direct release from prison or a shorter sentence" but sought "an examination" of the "policies and procedures governing access to prison programming and parole eligibility, consideration and release."  *Id.* at 210.  Like *Wershe*, that part of *Hill* confronted a challenge to parole procedures.  *Id.*  Kitchen's claim, in contrast, directly implicates his sentence.  *Hill* therefore does not dictate the outcome here.

Like *Wershe*, *Wilkinson* did not address a specific parole statute but addressed whether the correct parole guidelines had been used.  *See Wilkinson*, 544 U.S. at 82.  The prisoners in *Wilkinson* brought a challenge to the use of harsher guidelines adopted in 1998—years after they were sentenced—and wanted injunctive relief ordering the use of guidelines in place at the time they were sentenced.  *Id.* at 76–77.  The Supreme Court let the § 1983 claims proceed because the relief sought was parole consideration under proper guidelines.  *Id.* at 82 (explaining that the prisoners sought "relief that will render invalid the state *procedures* used to deny parole" (emphasis added)).  *Wilkinson* thus dealt with a procedural challenge to parole consideration, not a substantive challenge to an underlying sentence.  More precisely, the prisoners challenged a discrete change in law, separate from their original sentences, that was unlawfully depriving them of parole.

---

**9**One challenge in *Hill*—Count II in that case—dealt with juvenile offenders who could be resentenced to life without parole under the new statutory scheme.  *Hill*, 878 F.3d at 207–08.  Even though the prisoners framed their challenge as "seeking prospective relief against the resentencing process authorized by the revised statutory scheme," the court disagreed.  *Id.* at 208 (internal quotation marks omitted).  "The *Heck* doctrine instructs that no matter how a § 1983 claim is couched, if its success would *necessarily affect the length of a sentence*, the litigant must rely on habeas relief," and this is so even if plaintiffs "frame their challenge as one to the sentencing process."  *Id.* (emphasis added).  "Such a ruling would necessarily implicate the duration of Plaintiffs' impending sentences by imposing a ceiling, and . . . because Count II necessarily implicates the length of their impending sentences, it is not cognizable under § 1983."  *Id.* at 208–09.  The district court below admitted that success for Kitchen would lead to "a new, shorter minimum sentence."  *Kitchen*, 2019 WL 3859887, at *2.  The § 1983 claim here, despite Kitchen's best efforts to couch it as a challenge to the parole statute, thus disputes the length of his sentence.

In all three cases, the procedures denying the prisoners parole were separate from their original sentences, thus permitting an independent § 1983 challenge to those procedures. Kitchen cannot make the same claim. He tries to pitch this suit as an attack on the statute. But, as we've explained, his minimum sentence determines his parole eligibility, so he can't divorce his minimum sentence from his parole eligibility. It would therefore be wrong to treat the Michigan parole statute as some sort of independent legal device that he could now separately challenge.**10**

What's more, the relief granted by the district court below reaffirms that Kitchen's challenge, if successful, would imply the invalidity of his sentence. The district court moved Kitchen's parole-eligibility date to May 1, 2023, when he originally would not have been eligible until 2027. *Kitchen*, 2022 WL 18911614, at *1. If Kitchen's claim is successful, he will receive relief that effectively cuts short his sentence of forty-two years in prison before parole eligibility and resentences him to thirty-six years in prison before parole eligibility. In short, under Kitchen's original sentence, he must serve a minimum sentence of forty-two years, but under the district court's granted relief, he must serve only thirty-six. Because "his sentence would be different" after the district court's order, the relief implies "the unlawfulness of his sentence as originally imposed." *McCall*, 56 F.4th at 1058.

The district court admitted as much in its analysis. It reasoned that even "if Kitchen's direct attack on § 791.234 is an indirect attack on his 42-year minimum sentence," and even

---

**10**This understanding makes further sense when we examine how the Supreme Court has treated *Graham* challenges before. Take *Virginia v. LeBlanc*, 582 U.S. 91 (2017). There, a juvenile offender brought a habeas claim in federal district court under 28 U.S.C. § 2254, alleging that his sentence was unconstitutional under *Graham*. *Id.* at 92–93. At issue was whether Virginia's geriatric-release statute, Va. Code Ann. § 53.1-40.01, afforded prisoners like LeBlanc a meaningful opportunity for release. *Id.* at 92–94. The Supreme Court ultimately ruled against LeBlanc on his habeas claim. *Id.* at 96. But the merits of the ruling are not the main takeaway here. For our purposes, the salient point from *LeBlanc* is that habeas was the proper vehicle for bringing a *Graham* challenge. If Kitchen's theory were correct, then LeBlanc made a big mistake in bringing a habeas claim. All he really needed to do was frame his case as a challenge to the geriatric-release statute—the very statute that determined when he received parole—and then bring the claim under § 1983. This would have allowed LeBlanc to avoid habeas's exhaustion requirements, state-court proceedings, and deferential standards of review in federal court. Yet LeBlanc correctly brought his case through habeas because the heart of his claim was that *Graham* rendered his prison sentence unconstitutional. So too here. Kitchen believes *Graham* makes his forty-two-year sentence unconstitutional. This claim properly sounds in habeas, not § 1983. Indeed, the relevant habeas provisions specifically provide for this type of challenge. *See* 28 U.S.C. § 2254 (addressing how to challenge the constitutionality of one's confinement).

supposing "Kitchen's § 1983 complaint results in a new minimum sentence where he is given a 34- [or 36]-year minimum," Kitchen could still bring a § 1983 claim. *Kitchen*, 2019 WL 3859887, at *2. The district court conceded that success for Kitchen would mean "a new, shorter minimum sentence." *Id.* This admits that Kitchen cannot win his case without indirectly undermining his sentence. The Supreme Court is unequivocal that such a claim must go through habeas. *See Wilkinson*, 544 U.S. at 81; *Skinner* 562 U.S. at 533–34.

In sum, the court cannot grant Kitchen the relief he seeks without undercutting his sentence. His sentence put him in prison for forty-two years without parole. To order the Parole Board to consider him now rewrites that sentence.[11] This sort of adjustment lies in the province of habeas, not § 1983.

## V.

Our court has emphasized that, in this area of law, we must "adhere to the lines carefully drawn by the Supreme Court and this circuit." *Hill*, 878 F.3d at 211. Congress in enacting habeas and civil rights statutes and the Supreme Court in interpreting them have tried to mark that line using clear principles for when a claim falls into habeas versus § 1983. The dividing line the Court has settled on over several decades is that where a successful claim would necessarily lead to a shorter sentence or imply the invalidity of a sentence or conviction, the claim must be brought through habeas. Granting Kitchen the relief he seeks here necessarily implicates the validity of his sentence. So Kitchen's claim is not appropriate for § 1983 and instead must go through habeas. Kitchen's claim on remand should thus be dismissed. We REVERSE and REMAND.

---

[11]This point also shows the importance of federal–state comity in this area of law. The Supreme Court has explained that when a prisoner seeks to challenge the state's parole system, "strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." *Preiser*, 411 U.S. at 492. Because Kitchen brought his § 1983 claim directly to federal court, he has not attempted to challenge his confinement in state court. And because this is a challenge to a state law, comity concerns strongly support allowing state courts to first consider challenges to their state statutes before federal courts begin rewriting the sentences imposed under them.

---

**DISSENT**

---

HELENE N. WHITE, Circuit Judge, dissenting.  Nearly forty years ago, Michael Kitchen was sentenced to a lengthy prison term for offenses he committed when he was a minor.  He is now fifty-four years old and has served every day of his adult life behind bars.  And he must serve several more years before he becomes merely eligible for parole—at which point, assuming he survives, he will have reached the twilight of his life.  Kitchen filed this action under 42 U.S.C. § 1983, alleging that denying him parole consideration for so long violates the Eighth Amendment right of juvenile offenders to have a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *Graham v. Florida*, 560 U.S. 48, 75 (2010).  The majority holds that Kitchen improperly brought his claim under § 1983 and instead must petition for a writ of habeas corpus.  Because I conclude that Kitchen's action is cognizable under § 1983, I respectfully dissent.

**I.**

"Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983."  *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam).  But the statutes differ in important ways.  The habeas statute generally requires exhaustion of state remedies and restricts second or successive petitions, while § 1983 generally imposes neither of these procedural hurdles.  *See Heck v. Humphrey*, 512 U.S. 477, 480–81 (1994); *Nance v. Ward*, 597 U.S. 159, 167 (2022).  "Still more pertinent here, the scope of the two laws also differs."  *Nance*, 597 U.S. at 167.  Habeas relief is available for a prisoner held "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 1983 broadly authorizes relief against persons acting under color of state "statute, ordinance, regulation, custom, or usage" for violating "any rights . . . secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.

The Supreme Court has recognized a special habeas-channeling rule for certain claims that fall within the express terms of § 1983. "Read literally," the language of § 1983 "would apply to all of a prisoner's constitutional claims, thus swamping the habeas statute's coverage." *Nance*, 597 U.S. at 167. However, the habeas statute's "more specific" language, "the writ's history" as the means "to obtain release from [unlawful] confinement," and the comity concerns reflected in the habeas statute together have "led the Court to find an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus.'" *Wilkinson v. Dotson*, 544 U.S. 74, 78–79 (2005) (alteration in original) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 486–87 (1973)). If an action falls within that "core," it cannot be brought under § 1983 but only as a habeas petition. *See id.*

The "core" of habeas consists of actions "request[ing] present or future release." *Id.* at 81. In *Preiser*, which "initially addressed the relationship between § 1983 and the federal habeas statutes," *id.* at 78, the Court framed the "core" as a challenge to "the fact or duration of [a prisoner's] confinement" and "seeking immediate release or a speedier release from that confinement" as relief. 411 U.S. at 498. "Slightly less obvious," *Nance*, 597 U.S. at 167, but also included, is an action seeking to achieve "indirectly"—for example, through damages— what a prisoner cannot "do directly by seeking injunctive relief," *Nelson v. Campbell*, 541 U.S. 637, 647 (2004). Thus, in *Heck*, the Court held that a § 1983 claim is not viable if "a judgment in favor of the plaintiff would necessarily imply the invalidity of [the plaintiff's] conviction or sentence" that has not "already been invalidated." 512 U.S. at 487.

In synthesizing the doctrine, the Court in *Dotson* canvassed its "legal journey from *Preiser*" through *Heck* and onwards and said that the focus is "ensur[ing] that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." 544 U.S. at 81. The Court further said, "These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought . . . , no matter the target of the prisoner's suit . . . —*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82.

**II.**

The majority concludes that Kitchen must proceed through a habeas petition and not under § 1983 because, in its view, his "claim would necessarily imply the invalidity of his sentence if successful." Maj. Op. 15. Its reasoning appears to rest on two premises: (1) Kitchen's action, if successful, would necessarily imply the invalidity of the minimum-sentence provision of his judgment of conviction, which effectively sets his parole-eligibility date, and (2) the minimum-sentence provision is part of his "sentence" as *Heck* and related decisions use that word, *see* 512 U.S. at 487 ("necessarily imply the invalidity of [a prisoner's] conviction or sentence"). As the majority puts it, "when Kitchen complains of being kept in prison without parole, even if he frames it as a complaint against" Michigan Compiled Laws § 791.234(1)—the statute giving the Parole Board jurisdiction over prisoners once they have served their minimum sentences—"he is inevitably challenging his sentence, the true source of the alleged constitutional injury. If his challenge succeeds, his forty-two-year minimum sentence will be constitutionally invalid." Maj. Op. 18; *see also id.* ("So Kitchen being in prison without parole is not the sole product of Section 791.234(1). It stems from his sentence. It is impossible to challenge the statute as applied to a particular prisoner without attacking the sentence."). But the majority's second premise is incorrect; under Michigan's indeterminate sentencing scheme, a minimum-sentence provision is not within the specialized meaning of "sentence" in the context of the habeas-channeling rule.

**A.**

To start, I note that Kitchen's suit does not "seek to invalidate the duration of [his] confinement . . . directly through an injunction compelling speedier release," *Dotson*, 544 U.S. at 81 (emphasis omitted), or even through declaratory relief to the same effect. Rather, Kitchen challenges the parole statute, arguing that the Legislature's choice to tie parole eligibility to the minimum term of an indeterminate sentence is unconstitutional as applied to him because it deprives him of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *Graham*, 560 U.S. at 75. Thus, Kitchen's operative complaint requests a declaration that "§ 791.234(1) is unconstitutional as applied to [him] under the Eighth Amendment" and an injunction "requiring the Michigan Parole Board to immediately take

jurisdiction," "schedule a parole hearing," and give him the requisite meaningful opportunity for release.  R. 78, PID 697.

And the relief the district court ultimately ordered pursuant to the parties' agreed-upon plan required the Parole Board to "deny parole, defer the decision until Kitchen completes any recommended/relevant programs, or make the decision to release Kitchen on parole" by April 3, 2023, R. 122, PID 1517, and required the parties to complete other parole-related tasks by certain deadlines, *see id.* at PID 1516–17.  None of this relief requires the Parole Board to release Kitchen—ever, let alone on a date inconsistent with his judgment of conviction.  Given that Kitchen seeks "[n]either 'immediate release from prison,' [n]or the 'shortening' of his term of confinement," *Dotson*, 544 U.S. at 79 (quoting *Preiser*, 411 U.S. at 482), his suit does not constitute the classic scenario, involving relief directing immediate or sooner release from confinement, when the habeas-channeling rule comes into play.

**B.**

What of the "[s]lightly less obvious" scenario also subject to the habeas-channeling rule, *Nance*, 597 U.S. at 167, when a prisoner seeks to achieve "indirectly" what the prisoner cannot "do directly," *Nelson*, 541 U.S. at 647?  In this respect, too, Kitchen's suit is on solid footing, albeit for a different reason.  Even if the relief he seeks—a "meaningful opportunity to obtain release" via parole within a given timeframe—is logically inconsistent with his minimum sentence—the minimum amount of time beyond that date that he must stay in custody before he becomes eligible for parole—his suit is still properly brought under § 1983.  The reason, again, is that the minimum term specified in a Michigan indeterminate sentence like Kitchen's is not within the meaning of "sentence" as *Heck* and associated decisions use the term.

**1.**

*Dotson* illustrates why.  There, the Court considered whether two prisoners challenging Ohio's parole procedures properly brought their claims under § 1983.  *See* 544 U.S. at 76.  One prisoner, William Dotson, brought ex-post-facto and due-process challenges to state officials' use of parole guidelines adopted after his prison term began to determine his parole eligibility, seeking "an immediate parole hearing in accordance with the statutory laws and administrative

rules in place when he committed his crimes." *Id.* at 76–77 (cleaned up). The second prisoner, Rogerico Johnson, challenged retroactive application of the parole guidelines to determine his suitability for release, as well as the sufficiency of the parole board members present at, and the adequacy of the opportunity to speak during, his parole hearing, and he sought a new hearing with constitutional procedures and an injunction requiring future compliance with ex-post-facto and due-process requirements. *See id.* at 77.

The Court concluded that the prisoners' claims were "cognizable under § 1983, *i.e.*, they d[id] not fall within the implicit habeas exception." *Id.* at 82. "Dotson and Johnson [sought] relief that w[ould] render invalid the state procedures used to deny parole eligibility (Dotson) and parole suitability (Johnson)." *Id.* Neither prisoner sought "an injunction ordering his immediate or speedier release." *Id.* Nor would "a favorable judgment . . . 'necessarily imply the invalidity of [their] conviction[s] or sentence[s].'" *Id.* (second through fourth alterations in original) (quoting *Heck*, 512 U.S. at 487). "Success for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application." *Id.* And "[s]uccess for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term." *Id.* The same is true here; success for Kitchen means at most a parole hearing at which Michigan parole authorities may, in their discretion, decline to release him on parole.

Two principles expounded in *Dotson* are critical to Kitchen's case. First, an action attacking a prisoner's "sentence," in the relevant sense of the word, involves "the judgment authorizing the prisoner's confinement." *Id.* at 83. So whether an action is an attack on a "sentence," such that it cannot be brought under § 1983 and must be brought as a habeas challenge, turns on whether a favorable judgment in the action would invalidate or necessarily imply the invalidity of the State's judicial authorization to confine the prisoner.

This principle derives from the Court's response to the dissent's argument for "a different legal standard." *Id.* The dissent asserted that "a habeas challenge to a sentence (a 'core' challenge) does not necessarily produce the prisoner's 'release' (so [the Court's] standard 'must be . . . wrong')." *Id.* (second alteration in original) (citation omitted). The dissent noted that

"when a prisoner succeeds in a habeas action and obtains a new sentencing hearing, the sentence may or may not be reduced," and "[t]he prisoner's early release is by no means assured simply because the first sentence was found unlawful"; nonetheless, "it is elementary that habeas is the appropriate remedy for challenging a sentence." *Id.* at 88 (Kennedy, J., dissenting). The dissent thus contended that the Court was wrong to reason that an action seeking "an order entitling a prisoner to a new parole proceeding" was cognizable under § 1983 primarily because the action, if successful, "might not result in his early release." *Id.* The *Dotson* majority responded to this criticism by noting that "a case challenging a sentence seeks a prisoner's 'release' in the only pertinent sense: It seeks invalidation (in whole or in part) of the judgment authorizing the prisoner's confinement; the fact that the State may seek a *new* judgment (through a new trial or a new sentencing proceeding) is beside the point." *Id.* at 83.

Second, the State cannot shoehorn any provision it wishes into a prisoner's "sentence" and thereby force the prisoner to challenge that provision through a habeas petition. If State law requires a sentencing court to include a provision in the judgment of conviction *beyond* the authorization to confine a prisoner, that provision is *not* part of the "sentence" for purposes of the habeas-channeling rule, and the prisoner may challenge the provision through a § 1983 claim.

This second principle comes from the *Dotson* Court's rejection of one of Ohio's arguments. The State "point[ed] to language in *Heck* indicating that a prisoner's § 1983 damages action cannot lie where a favorable judgment would 'necessarily imply the invalidity of his conviction *or sentence*.'" *Id.* (quoting 512 U.S. at 487). The State "then argue[d] that its parole proceedings are part of the prisoners' 'sentence[s]'—indeed, an aspect of the 'sentence[s]' that the § 1983 claims, if successful, will invalidate." *Id.* (second and third alterations in original). The Court said, however, that "*Heck* uses the word 'sentence' to refer not to prison procedures, but to substantive determinations as to the length of confinement" and "uses the word 'sentence' interchangeably with such other terms as 'continuing confinement' and 'imprisonment.'" *Id.* (quoting 512 U.S. at 483). "Indeed, th[e] Court has repeatedly permitted prisoners to bring § 1983 actions challenging the conditions of their confinement—conditions that, were Ohio right, might be considered part of the 'sentence.'" *Id.* at 84.

Applying these two principles here, Kitchen's action is cognizable under § 1983. All his suit necessarily seeks is consideration for parole, which the Parole Board may, in its discretion, deny. Even if a favorable judgment would necessarily imply the invalidity of the minimum-sentence provision of his judgment of conviction, as the majority seems to conclude, that implication is of no consequence because the State cannot deem whatever it pleases to be part of a prisoner's "sentence" and thereby dictate the statutory vehicle by which the prisoner may vindicate a constitutional right. A "sentence" in the special *Heck*-sense of the word is the judgment (or portion thereof) giving the State authorization to confine a prisoner. Here, that authorization comes from the fact of conviction combined with the maximum-sentence provision of Kitchen's judgment, not the minimum-sentence provision. Given that Kitchen seeks mere consideration for parole and that the Parole Board retains discretion to deny it, the State will possess lawful authority to confine him for the same amount of time—his maximum sentence—regardless whether his suit succeeds. Put differently, the lawfulness of Kitchen's "'continuing confinement' and 'imprisonment,'" *id.* at 83 (quoting *Heck*, 512 U.S. at 483)—in the past, present, and future—is not necessarily negated by any implied invalidation of a provision of his judgment that solely defines, by virtue of Michigan Compiled Laws § 791.234, when he is eligible for consideration for parole. Thus, Kitchen's claim does not fall within the habeas-channeling exception to § 1983.

**2.**

The doctrinal evolution of the habeas-channeling rule confirms this conclusion. Again, *Preiser* held "that when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." 411 U.S. at 500. *Heck* extended this holding "to prevent inmates from doing indirectly through damages actions what they could not do directly by seeking injunctive relief—challenge the fact or duration of their confinement without complying with the procedural limitations of the federal habeas statute." *Nelson*, 541 U.S. at 647. So *Heck*'s language on whether an action "would necessarily imply the invalidity of" a prisoner's "sentence," 512 U.S. at 487, appears merely to account for *Preiser*'s language concerning whether an action would directly cut short the

"duration of [a prisoner's] imprisonment" through relief requiring "immediate release or a speedier release from that imprisonment," 411 U.S. at 500.

*Dotson*'s synthesis of the doctrine also suggests as much. The Court said that prisoners must proceed through habeas when "seek[ing] to invalidate the duration of their confinement— either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the *unlawfulness* of the State's *custody*." 544 U.S. at 81 (third and fourth emphases added). It also said "that a state prisoner's § 1983 action is barred (absent prior invalidation) . . . *if* success in that action would necessarily demonstrate the *invalidity* of *confinement* or its *duration*." *Id.* at 81–82 (second through fourth emphases added). And as already explained, a minimum sentence in Michigan determines only when a prisoner can be considered for discretionary parole, so a suit that necessarily implies the invalidity of a minimum sentence in Michigan—yet leaves untouched the fact of conviction and the maximum sentence—does not necessarily implicate the validity of the State's "custody" or "confinement" of the prisoner or the "duration" thereof.

Further, in explaining why "a favorable judgment w[ould] not 'necessarily imply the invalidity of [Dotson's or Johnson's] conviction[s] or sentence[s]," 544 U.S. at 82 (third and fourth alterations in original) (quoting *Heck*, 512 U.S. at 487), the Court said only this:

> Success for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application. Success for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term. Because neither prisoner's claim would necessarily spell speedier release, neither lies at "the core of habeas corpus."

*Id.* (quoting *Preiser*, 411 U.S. at 489) (citations omitted). In other words, the nonimplication of immediate release or a shorter stay in prison in the event of Dotson and Johson's success determined whether their actions would necessarily imply the invalidity of their sentences. And here, a favorable judgment in Kitchen's suit does not implicate immediate release or a shorter stay in prison, thus indicating an attack on a Michigan minimum-sentence provision—as the majority views this case—is not subject to § 1983's habeas-channeling exception.

**3.**

The Court's cases applying the habeas-channeling rule to actions by prisoners sentenced to death corroborate this reading of "sentence." In *Skinner v. Switzer*, 562 U.S. 521 (2011), the Court held that a prisoner could bring a claim under § 1983 seeking DNA testing of crime-scene evidence on due-process grounds. *See id.* at 524–25. The government argued that the relief had to be sought through habeas because the prisoner's "*ultimate* aim . . . is to use the test results as a platform for attacking his conviction." *Id.* at 534. Rejecting that argument, the Court said "[i]t suffices" that the government "has found no case, nor has the dissent, in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'" *Id.* (quoting *Dotson*, 544 U.S. at 86 (second through fourth alterations in original) (Scalia, J., concurring)). That language—focusing on terminating custody, accelerating release, or reducing the level of custody—provides a useful gloss on what the Court means by "necessarily imply the invalidity of [a] conviction or sentence," *Heck*, 512 U.S. at 487. And notably, none of these outcomes would result from a federal court finding Michigan Compiled Laws § 791.234 unconstitutional as applied to Kitchen and requiring that the Parole Board simply consider Kitchen for parole before his minimum sentence has elapsed.

**C.**

Moreover, applying the habeas-channeling rule to dismiss a § 1983 claim does not just eliminate the claim unless and until a prisoner successfully invalidates the conviction or sentence through available state remedies or a federal habeas petition; it also effectively holds that the claim is properly the subject of a habeas petition. *See Muhammad*, 540 U.S. at 755 ("[The prisoner] raised no claim on which habeas relief could have been granted on any recognized theory, with the consequence that *Heck*'s favorable termination requirement was inapplicable.").

Justice Scalia, the author of *Heck*, made this point in his *Dotson* concurrence, when he explained that the consequence of holding that the challenges brought there were subject to the habeas-channeling rule would be to "broaden the scope of habeas relief beyond recognition":

*Preiser* . . . and the cases that follow it hold that Congress, in enacting § 1983, preserved the habeas corpus statute as the sole authorization for challenges to allegedly unlawful confinement. At the time of § 1983's adoption, the federal habeas statute mirrored the common-law writ of habeas corpus, in that it authorized a single form of relief: the prisoner's immediate release from custody. Congress shortly thereafter amended the statute, authorizing federal habeas courts to "dispose of the party as law and justice require." The statute reads virtually the same today. We have interpreted this broader remedial language to permit relief short of release. For example, when a habeas petitioner challenges only one of several consecutive sentences, the court may invalidate the challenged sentence even though the prisoner remains in custody to serve the others. Thus, in *Preiser* we held the prisoners' § 1983 action barred because the relief it sought— restoration of good-time credits, which would shorten the prisoners' incarceration and hasten the date on which they would be transferred to supervised release— was available in habeas.

It is one thing to say that permissible habeas relief, as our cases interpret the statute, includes ordering a "quantum change in the level of custody," such as release from incarceration to parole. It is quite another to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody. That is what is sought here: the mandating of a new parole hearing that may or may not result in release, prescription of the composition of the hearing panel, and specification of the procedures to be followed. A holding that this sort of judicial immersion in the administration of discretionary parole lies at the "core of habeas" would utterly sever the writ from its common-law roots.

544 U.S. at 85–86 (Scalia, J., concurring) (citations omitted).

Justice Scalia's observations are apt here. Holding that relief determining a prisoner's eligibility for an initial hearing for discretionary parole lies at the "core" of habeas, as the majority does here, likewise strays far from the writ's traditional roots.

**D.**

Finally, the majority's decision will yield disparities among prisoners' suits—a point the *Nance* Court highlighted in rejecting the applicability of the habeas-channeling rule. There, the Court held that a prisoner need not bring an Eighth Amendment claim challenging the only method of execution authorized by State law through a habeas petition, and could instead proceed under § 1983, "even if the alternative" method that the prisoner identified as feasible and readily available "necessitates a change in state law." 597 U.S. at 169–70. The Court reasoned,

in part, that "[u]nder the contrary approach, the federal vehicle for bringing a federal claim—and with that, the viability of the claim—would depend on the vagaries of state law." *Id.* at 172. In states where the alternative method was not authorized under then-existing law, a prisoner "would have to bring his claim in a habeas petition." *Id.* Yet in states where the alternative method was authorized, a prisoner "could file a § 1983 suit." *Id.* "It would be strange," the Court said, "to read such state-by-state discrepancies into our understanding of how § 1983 and the habeas statute apply to federal constitutional claims." *Id.* at 173.

Discrepancies are precisely what the majority's decision invites. Even worse, the discrepancies may be within-state. Individuals convicted of certain offenses in Michigan may receive sentences of life imprisonment, in which case they do not receive minimum sentences and are not within the ambit of Michigan's indeterminate-sentencing scheme. *See* Mich. Comp. Laws § 769.9(2) ("The court shall not impose a sentence in which the maximum penalty is life imprisonment with a minimum for a term of years included in the same sentence."). By statute, with some exceptions based on the offense of conviction, prisoners sentenced to life become eligible for parole after serving specified years in prison. *See* Mich. Comp. Laws § 791.234(7). So for these prisoners, the target of an action challenging parole eligibility could not be any minimum-sentence provision found in the judgment, only the parole statute itself. Thus, under the majority's approach, some prisoners seeking to challenge the timing of their parole eligibility need to proceed via habeas, while others can proceed under § 1983. In fact, this discrepancy could occur for two co-defendant prisoners convicted of the *same* offense where a court sentences one to life imprisonment and the other to an indeterminate sentence.[1] "[S]trange" indeed, 597 U.S. at 173.

---

[1]Consider this example: A Michigan sentencing court may sentence a defendant convicted of assault with intent to commit murder to an indeterminate sentence or to life imprisonment. The defendant may become eligible for parole at the same time regardless of the court's choice—but under the majority's reasoning, the sentencing decision would determine whether the defendant could bring a constitutional challenge to parole eligibility under § 1983 or only in a habeas petition. *See People v. Gilbert*, 455 N.W.2d 731, 735–36 (Mich. Ct. App. 1990) (noting that a prisoner with a life sentence for assault with intent to commit murder "will be eligible for parole at the same time he would have been if the circuit court had sentenced him to the shortest minimum sentence recommended by the guidelines," i.e., ten years, because by statute, "a prisoner serving a life sentence is eligible for parole after serving a ten-year minimum sentence").

**III.**

In sum, Kitchen does not challenge his sentence, but, rather, the State's choice to tie parole eligibility to the minimum term of an indeterminate sentence as violative of the Eighth Amendment as applied to him. But even if Kitchen's challenge is viewed as an action necessarily implying the invalidity of the minimum-sentence provision of his sentence, under Michigan's indeterminate sentencing scheme, success would not necessarily implicate the lawfulness of the State's confinement of Kitchen, either from the start or any time thereafter. Thus, his action is not subject to § 1983's implicit habeas-channeling exception and was properly brought under § 1983.